case in the country right now. That may sound like a wild claim, but I'll defend it. This case is not just about gold and silver, bars and coins. It's about our federal system, stability, and the limits on states' authority. The Commissioner is taking the extravagant position that Minnesota may imprison its domiciliaries for transactions they conduct anywhere in the universe. She is taking this position on appeal, even though she lost on this issue and the District Court does not cross appeal. I want to convey some sense of the implications of the Commissioner's position on extraterritoriality in this case. As this Court is aware, the Supreme Court is reconsidering Roe v. Wade. The Missouri legislature has already proposed imposing liability for assisting a Missouri resident in having an abortion outside of Missouri, for example, paying for it. If the Court adopts the Commissioner's position, which again was constitutional doctrine, will exist to stop this. And once states learn that they can regulate their residents or domiciliaries beyond their borders, they'll do it. As massive as statute books are in this country, they'll become even larger through the enactment of universe-wide laws. On extraterritoriality, although this is an important case, it's not the Supreme Court held that New York could not regulate the purchase of milk by one New York corporation from another New York corporation if the purchase occurred in Vermont. That case is binding and decides the case against the Commissioner. Not surprisingly, lower courts in applying the extraterritoriality doctrine have treated transactions as being out of state if they are conducted by parties who are physically present outside of the regulatory state's borders. For example, in the San Francisco Foundation v. Christie's Inc., a Ninth Circuit case in 2015, the Court held that California cannot regulate out-of-state sales by California residents. In short, the Commissioner's position that a transaction is never wholly out of state if it is conducted by a resident or domiciliary is incorrect. The case law states otherwise. If Minnesota cannot regulate Minnesotans doing out-of-state transactions, it follows Minnesota cannot regulate out-of-state citizens and businesses doing business out-of-state. Yet, that's what the Commissioner seeks in this case. The lower court had a misguided distinction. The district court relied on a misguided distinction between regulating the terms of a transaction and requiring a license to engage in a transaction. This explains why the lower court struck down 80G.07, regulating terms of a transaction, and not 80G.02, requiring registration for a transaction. With all due respect to the district court, this distinction has no basis in law. The Supreme Court held in Healy v. Baer Institute that no state may force an out-of-state merchant to seek regulatory approval in one state before undertaking a transaction in another. Counsel, I'd like to ask you a question about the operation of the statute. Does it make any difference to our analysis that in-state activity is required to trigger the statute and its regulation of out-of-state commerce? No. Whether it's in-state or out-of-state transactions, to get to the threshold limit, that may or may not be a violation of extraterritoriality doctrine. But what's important here is once the threshold is met, like for my clients, then there's a restriction on out-of-state transactions because you're over the threshold limit. One dollar of an out-of-state transaction is unlawful unless you register. In order to go beyond the threshold limit with an out-of-state transaction, you have to register in Minnesota or it's unlawful. So for Tom, the coin guy at LLC, once he's hit the threshold, he can't do an out-of-state transaction without registering in Minnesota. He's got to get prior approval. So to put it another way, Minnesota's registration requirement is a requirement of regulatory approval for out-of-state transactions. If a merchant is registered with Minnesota, it has approval for out-of-state transactions. If a merchant is not registered in Minnesota, the merchant does not have approval for those transactions. The transactions are lawful because you're unregistered. Counsel, as I understand it, you're bringing in a facial challenge. Is that correct? Under the per se rule, correct. And so there's many cases that support our position. We went through the U.S. Supreme Court cases, Healy, Brown-Forman, which rely on the plurality opinion in Edgar, going back to Bolden v. Seelig. The lower court decisions, say, in the Middle East or Midwest title, the Judge Posner decision from 2010, that was regarding a licensing scheme, Indiana licensing scheme. McElmore, the Middle District Tennessee case, we noted the supplemental authorities letter summary judgment was granted against the licensing scheme regarding auctioneers. That was March 23rd, that decision came down. I mentioned the Ninth Circuit case, San Francis. In the district court, the commission took the position that AEG did not apply to out-of-state transactions by out-of-state businesses, but the district court rejected that position as anti-textual when it struck down ADG.07. That's important to understand that ADG.07 was struck down because of extraterritoriality by the district court, and now we're on appeal and we're hearing many of the same arguments. Once an out-of-state merchant becomes subject to the registration requirement through engaging a transaction with a Minnesota consumer and reaching the $25,000 threshold, an unregistered out-of-state merchant will incur liability for an out-of-state transaction with a consumer, even a non-Minnesota consumer. Going back to your question, I just want to clarify that counting the out-of-state transaction registration threshold may be a violation of the extraterritorial doctrine, but requiring registration for out-of-state transactions once the $25,000 threshold is met is definitely a violation. In fact, you probably won't find a more flagrant violation of the Dormant Commerce Clause than having to be registered before doing out-of-state transactions. On the excessive burden and the ETFs, the ADG.01 includes in its definition of dealer any person who, quote, buys, sells, solicits, or markets, quote, investments in bullion products, end of quote. ETFs such as, and I'll give you the ticker names, SPDR, GLD, SLV, PPLJ, PALL are traded in the stock exchanges. They are trusts that own bars of the metal. The owners have undivided fractional beneficial interest in the precious metal bars. Thus, an investment in bullion products. But the problem is, stock market exchanges are designed to be anonymous transactions, so it's impossible for a purchaser or seller of these ETFs to know if they're dealing with a Minnesota resident or domiciliary. Is the argument that if you purchase a share of an ETF, you become a dealer under the statute? Is that the argument? Right. Because of the reference under ADG.01, to anyone who buys, sells, investments in bullion products. And so, investments in bullion products, the ETFs would be an investment, and the bullion product is that these ETFs hold gold and silver, platinum and palladium bars. And so, the government is arguing, well, obviously we didn't mean that type of investment in bullion product, but that's not how a narrowing construction works. You have to follow the ordinary meaning. And so, we just read the statute, and our clients want to engage in ETFs, purchasing and selling them. Do you still have the territorial requirements in the subsection A.1, 2, and 3, then, that would apply to dealers who are ETF purchasers, just so I understand how that would work? Right. So, dealers who are involved in the ETFs would have to, if they meet the threshold requirement, register as a dealer, post a security bond, and meet the other requirements of the statute, other than ADG.07, because that has been found unconstitutional. Now, under the bonding provision, does that apply to unregistered dealers as well, or is it only dealers who reach the 25,000 threshold? Only those that are registered would have to post a… And where do you get that from? I'm just reading subsection A, it says every dealer, but maybe I'm missing every registered dealer. Yeah, the dealer is defined to include the $25,000 threshold. Okay. So then, moving on to severance, the territoriality permeates the text of ADG, and it seems like a big deal, you know, but there are only 11 sections, and the first section is definitions. And so, the definition of dealer and investment in bullion products we discussed, that's in there. ADG.02 is the registration requirement, but 0.03, 0.04, and 0.05 are related, covers renewal, non-renewal, criminal convictions, and so forth, can't get registered. ADG.06 is a surety bond, which we just discussed with the judge's question, is tied into the registration requirement. ADG.07 has already been found unconstitutional by the district court. So, ADG.08 through 11, those are the enforcement notice provisions, but if what's left is ADG.08, 0.11, then, well, what are you enforcing? Because all the substantive provisions are gone. So, now, when you're trying to excise the exterritoriality aspects from a statute, you've got to empathize with the state legislature, because what they were trying to do, and I'm advising them, was we want to have a level playing field. If we're going to impose these costs on in-state transactions, we want to impose these costs on out-state transactions, too. Well, how can a court come in and say, okay, we're not going to have those costs on out-state transactions, because the legislature's intention may have been a level playing field, and they might conclude, we're not going to impose these costs on these transactions at all. And so, it's a really kind of a simple one, because the court, I think, has to suffer in this situation, because the legislature was trying to be fair, and if the court says, well, we're not going to apply these to out-state transactions, but only in-state transactions, that's hardly fair to our in-state merchants. They should have a shot at the state legislature. Counsel, let me see if I understand this, and ask for your help here. Does your argument here all hinge on the registration requirement? For example, if the registration requirement were determined to be invalid, does that automatically make the bond requirement of no effect, because the bonding applies only to dealers that are registered? Precisely. If you have no registration and no bonding, and you have no conduct rules, then the entire statutory framework is devoid of any effect. Have I stated your contention, although crudely? No, precisely. And the same goes for .03, .04, and .05, relating to registration, like non-renewal, renewal, you have a criminal conviction, you can't be registered, and so forth. So, it all collapses, exactly. I'll save the rest of my time for rebuttal. All right, thank you. All right, Mr. Barr? Thank you, Your Honor. May it please the Court, my name is Alan Barr. I represent the Appalachian in this case, Commissioner of Commerce of Minnesota, Grace Arnold. The Court should affirm the District Court's order, because Minnesota's coin, bully, and dealer registration law is not extraterritorial, and does not unduly burden interstate commerce. Law imposes minimal requirements. You have to pay a $25 registration fee and obtain a surety bond if you do more than $25,000 worth of sales and either buy and sell in Minnesota, or your business is based in Minnesota. Counsel, just going back to my question to your friend, you would agree that the bonding requirement only applies to registered dealers, is that correct? Yes, Your Honor, I would agree. Because that's not the way I read the statute. I read the statute to say any dealer, but it's entirely possible I misread that. I think it would be difficult to apply the bonding statute, to read the bonding requirement to apply to any dealer, given that it requires a bond to renew. I agree, which is why I couldn't figure it out. When I look at that section, registration is 80G.02 and has a definition. I'm sorry, under the definition section, subdivision 3 is dealer. And then when you get to the surety bond, .06, it says every dealer shall maintain a current valid surety bond. Why doesn't that apply to dealers that haven't hit $25,000 in required registration? I understand it strikes me as unworkable, but when I'm reading the statute, I must be misreading it if both of you disagree. I think it would be unworkable otherwise, such that the legislature couldn't have intended it, particularly given the language of the last sentence that the bond has to be renewed during the 12-month period prior to registration or renewal, whichever is applicable. So I think reading that together is clear that that bond only applies to registration. Turning to the in-state dealers selling $1 and then going and selling $24,999 elsewhere, that is not an extraterritorial requirement. What would make you subject to discipline in Minnesota and subject to the potential actions the commissioner could take against you would be the Minnesota sale. So, for example, if Minnesota wanted to, they could say if you do $1 in Minnesota sales, you have to register. But instead what the legislature chose to do is to set up a $25,000 threshold to allow hobbyists to do sales in Minnesota without having to register. That doesn't mean that those out-of-state sales are subject to Minnesota regulation. Rather, it's the Minnesota sale that's going to trigger the registration requirement and trigger any consequences. If you don't sell in Minnesota... Counsel, let me ask you about that. If that's true, what is the timing of that registration requirement? Let's suppose that there was a sale of a $1 coin in Minnesota, and then they waited nine months with no activity at all, and then they sold $24,999 out of state. Isn't that when the registration requirement would be triggered? Yes, that's correct. The registration requirement would be triggered at that time. But they're only regulating the dollar sale. That's correct. They're going to be subject to discipline because they engaged in the sale in Minnesota. And Minnesota can look to nationwide sales, including after-the-fact sales, to determine whether or not someone has to register. Minnesota could prohibit all sales in Minnesota and say, you do even one, you're going to have to register. They're cutting dealers a break by saying, we're going to look at your total business, and if you don't meet a threshold, regardless of where those sales are, then you're going to have to register once you get over that threshold. This court has approved looking to nationwide sales to determine in-state obligations in Grand River Enterprises. In that case, Arkansas required cigarette companies to pay into a fund based on Arkansas sales, but then they could get a partial refund looking at nationwide sales. The nationwide sales effectively impacted your in-state obligation. The court nevertheless held that that practice was not extraterritorial, even though Arkansas was looking to out-of-state sales. The Second Circuit has been even more explicit in the Visio case cited in our brief. In that case, Connecticut said that fees should be calculated based on available national market share data. Second Circuit nevertheless upheld the law because it does nothing to control interstate commerce, merely considers out-of-state activity and imposing in-state charges. Minnesota is doing the exact same thing. Its registration requirement isn't controlling what dealers can do out-of-state. Instead, it is only looking to see what is your nationwide total sales, and if you meet that amount, if you are doing something in Minnesota. If you are buying and selling a bullion coin, then you have to register. With respect to in-state dealers conducting business out-of-state, those transactions are not, excuse me, those individuals' conduct is not wholly out-of-state. There is still an in-state nexus that makes them have to register. Specifically, the choice to set up business in Minnesota. Typically, these businesses are taking payments into Minnesota bank accounts, shipping bullion from Minnesota, or receiving bullion in Minnesota. So it's incorrect for appellants to say that there is no Minnesota connection to those individuals. Because even if they are shipping products out-of-state, there is still in-state conduct giving Minnesota a nexus to regulate their activity. Moreover, appellants also propose the example of, say, someone goes to Alaska, buys and sells products there, never sends anybody to or from Minnesota. Even if those activities aren't occurring in-state, the business still has a Minnesota connection such that it can be regulated. The business exists because it chose to incorporate in Minnesota or execute a partnership agreement in Minnesota. It's also consistent with the formulations from the cases cited by appellants in both Brown-Forman and Healy that no state may force an out-of-state merchant to seek regulatory approval for something occurring wholly outside the state's borders. That test isn't met here because if it's an in-state dealer, then the company is not an out-of-state merchant. Now, appellants do cite Baldwin and say that, well, in that case, it was a New York company, and nevertheless, the court held that New York couldn't regulate the company. Baldwin is clearly an economic protectionism case. Throughout the discussion of Baldwin, the concern the court had is that New York was setting up barriers to trade between the states and trying to force out-of-state transactions in a way that would be favorable to in-state interests. Here, we have the precise opposite. Minnesota dealers are at a disadvantage because they have to register in a way that out-of-store dealers do not. It is thus far from clear that Baldwin would say that Minnesota is a statutory agreement. I think Baldwin, frankly, is mostly inapplicable in light of the fact that its concern was economic protectionism. The same is true of the Ninth Circuit case cited by appellants with respect to California regulating out-of-state art deals. In that case, California required those out-of-state transactions to send money back to California. Again, that's an economic protectionism scheme that was struck down. You don't have economic protectionism concerns here, and under the formulation of Healy and under Brown-Forman, it's clear that Minnesota can require its own domiciliaries to get a license if they're going to set up a shop here. Turning to the issue of undue burdens, I believe Judge Cobes asked whether this comes down to, do you need a license to buy and sell these shares? You don't. The statute requires you to get a license to buy and sell investments. Although Mr. Cardell claims that they're looking at the language of the statute, the definition of an investment is the asset acquired or the sum invested. If you are acquiring a share of a company, you are not acquiring the goods that the company possesses. As a result, Minnesota does not regulate those ETF sales because the share buying and selling isn't a Gould-Boolean product. On appeal, appellants argue for the first time that when you buy a share, you get a fractional undivided beneficial interest in what the company owns. That was not pled below, but even if the court considers that argument, a beneficial interest would be a right or an expectancy in something, such as a trust, as opposed to the legal title for that thing. For example, a person with a beneficial interest in a trust receives income from the trust, but doesn't hold legal title to the trust property. So even if these ETF shares have these fractional undivided interest, that still wouldn't be an investment in a Boolean product, such that a person that is buying or selling them to consumers has to register. The asset is the share, not a product subject to registration. Even if the court finds this ambiguous, as noted in our brief, the legislative history, as well as the provisions regarding prohibited practices, make clear that all ADG is concerned about is transactions where someone is eventually going to receive a physical Boolean product. Finally, with respect to appellant's arguments regarding severance, I think appellants are speculating when they say that the legislature had particular goals in mind. The legislative history that we've said in our brief makes clear that the legislature's goal was to help protect Minnesota consumers. The statute as a whole does that and should be affirmed because it is constitutional. But even if the court disagrees, striking the provisions with respect to extraterritoriality and leaving the other provisions intact, so for example, saying that this statute cannot be applied against out-of-state transactions, would still further the legislature's goal. As a result, there's perfectly adequate ways for the court to strike the statute in the event it finds portions of it unconstitutional without resorting to striking the entire statute. Appellants have not presented any argument for why the statute could not be constitutionally applied to in-state dealers doing in-state transactions of non-exchange traded funds. Therefore, the entire statute should not be stricken and the court should instead strike those portions, if any, that would be unconstitutional. Unless the court has further questions, I'll stand on my brief. Very well. Thank you, Mr. Barr. And does Mr. Cardall have any time remaining? Yes, he does, Your Honor. Two minutes. Thank you, Your Honor. I just wanted to point out that virtually all these arguments that would make constitutional arguments made by my friend representing the commissioner were rejected by the lower court in finding 80G.07 unconstitutional. So that's really important because the state did not appeal from that aspect of the judgment. And so here we are, and the fight should be over why the judge distinguished between 80G.07 and 80G.02. And the way she distinguished them was she said that the extraterritoriality doctrine applies to regulations on conduct, not registration requirements. And there's no case law to support that at all. In fact, the cases that we've cited say that a state can't require a merchant, even its own merchant, to obtain approval from that state before engaging in transaction in another state. And, of course, physically present transactions we've been describing. With respect to the reading of the cases, particularly Baldwin v. Selig, there are decades of interpretations of Baldwin v. Selig. I recommend the U.S. Supreme Court cases I cited, the appellate cases I cited. But also there's a treatise-like discussion in the Berman v. City of New York case, the 2012 case, 895F sub 2nd 453, where all the stuff has gone over. And it's recognized that Baldwin v. Selig has come to be understood as a seminal case on extraterritoriality doctrine. And as I began, you know, this extraterritoriality doctrine, if we don't have a firm view on it from the judicial branch, you know, state legislatures and these agencies are going to start passing laws with universal application. I mentioned the abortion case possibly in Missouri post-Dobbs. So there's a real concern here about the stability of our federal and state system and federalism. Thank you. Counsel, question. Your colleague has explained how, to his way of thinking, the statute can be applied in a constitutional way. If the person involved, you only counted in state, in state sales. So if there's a way that the statute can be applied constitutionally, why doesn't that save the statute? Well, I think that one of the first reactions is my friend cited that this was to allow hobbyists to operate. But quite frankly, we're talking about gold and silver eagles. They're alternatives to banks. A lot of low income people, other people don't want to be in banks and they want to save these U.S. tender. And so it's not clear like where the court would draw the line on the twenty five thousand. Would it be something less? Would it be one dollar? The idea that, you know, investors with their retirement funds are investing twenty five thousand dollars in U.S. mint coins, gold and silver eagles. And the court's going to decide whether they have to register as dealers. Remember, it wouldn't be twenty five thousand dollars in possession if you're going in and out. Twenty five thousand dollars in aggregate of transactions triggers the dealer requirement. So maybe they have a view of hobbyists, but they certainly weren't looking for consumer investors. And a lot of the problems here come to they really define well what a consumer was and what a dealer was. So consumers become dealers. Like if you're investing in coins as part of your retirement portfolio, even through an IRA, this law applies and you need to apply as a dealer. That's the first thing I did was check. So anyway, the point that we have to be concerned about these kind of laws and whether the court is tripping up on legislative prerogatives when it's sort of guessing at the intent of the legislature. So my collateral point to my friend's point would be, sure, they're trying to protect consumers, but they're also trying to be fair to in-state merchants. That's why they're imposing the same requirements out of state transactions in state transactions. It's important to point out Treasure Island coin in the sworn declaration says it won't do any business in Minnesota because the registration applies to out of state transactions. They just don't want to be involved. So part of this case is can we help Minnesota consumers have a restart on the statute? Thank you. All right. Well, thank you, counsel, for your arguments. Cases submitted and court will render a decision in due course. Does that conclude our calendar for this afternoon? Yes, it does, Your Honor. Very well. Court will be in recess until 830 tomorrow morning. Thank you.